UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY  DIVISION

KAYLA IRWIN,                              )
          Plaintiff,                     )
                             )
    vs.                                   )          4:08-cv-188-RLY-WGH
                             )
CITY OF LAWRENCEBURG, INDIANA,  )
et al.,                                   )
          Defendants.                    )

**ENTRY ON DEFENDANTS' SUMMARY JUDGMENT MOTION**

On November 9, 2007, Plaintiff, Kayla Irwin ("Plaintiff"), returned home to the

apartment in Lawrenceburg, Indiana, where she and her two children lived to find a police

officer and the apartment manager standing outside the apartment building.  The police

officer informed Plaintiff that it had been reported to the police that an individual known

as Sean "Snowflake" Deaton had entered her apartment.  The police officer described

Deaton as an armed and dangerous criminal.  Plaintiff offered the key to her apartment to

the officer, but he indicated that he was waiting for the return of another officer with a

search warrant and that Plaintiff should stand clear from the building.

The police were on the scene at the Village Apartments as a result of a call placed

to the police by Sean Deaton's former wife, Terri Deaton, who called to alert the police

that her ex-husband was at the apartment building and that he was the subject of an arrest

warrant in Ohio.  Officer Nicholas Myers ("Officer Myers") was dispatched to apartment

407G at the Village Apartments and, while he made his way there, he instructed dispatch to "run the information" on Sean Deaton through the National Crime Information Center database to determine if there were any outstanding warrants for his arrest. That "run" apparently confirmed the existence of an outstanding warrant, and made some mention of Deaton's propensity for violence, though the record is without clarification as to exactly what the description was that was included in the NCIC report. The report itself was not made a part of the record. Officer Myers also contacted Officer Daniel Rosengarn ("Officer Rosengarn") and asked for his assistance with the incident. While speaking with Officer Rosengarn, Officer Myers was contacted by dispatch once more and informed that Terri Deaton had called again to report that Sean Deaton was now outside the apartment building and that her father had also seen Deaton flee into apartment 407G.[1] The two officers proceeded to the apartment building, where they were met by Terri Deaton.

According to Officer Myers, Terri Deaton appeared nervous and was shaking in apparent fear of her ex-husband being in the area. She told Officer Myers that she had seen her ex-husband enter apartment 407G, come back outside, and then return to the apartment right before the officers arrived. She had not seen him leave the apartment.

_____

[1]The court recognizes the inherent conflict in the dispatch report of this second telephone call, that being Sean Deaton coming out of the apartment and his former father-in-law seeing him flee into the apartment, but this is the description contained in the affidavit of Officer Myers. Of note is that in his deposition, Officer Myers makes no mention of receiving this second call from dispatch.

Officer Rosengarn made his way to the back of the building while Officer Myers obtained further details from Terri Deaton.  She provided Officer Myers with a description of Sean Deaton and indicated he was known to possess a small handgun, but she did not report that she had seen him with the gun that evening.  After speaking with the officers, Terri Deaton returned to her own apartment.  Knocks on the door of apartment 407G by the officer went unanswered, as did phone calls to Sean Deaton's cell phone.  Officer Myers determined that there was a need to obtain a search warrant and he placed a call to the prosecutor's office.

The police supervisor, who was about to come on shift, Sgt. Michael Lanning ("Sgt. Lanning"), contacted Officer Myers by phone to receive a briefing on the situation. After speaking with Officer Myers, Sgt. Lanning contacted Lieutenant Charles Evans ("Lt. Evans"), who also serves as the police department's negotiator when circumstances warrant the use of one.  Lt. Evans advised Sgt. Lanning that, because the suspect at issue was reportedly armed and not responding to efforts to communicate with him, the department's Critical Incident Response Team ("CIRT") should be assembled for a response.  It is unclear what prompted Lt. Evans' belief that Deaton was armed.  Sgt. Lanning arrived at the Village Apartments and released Officer Myers to pursue the search warrant with the prosecutor's office.  After Officer Myers provided his affidavit, the prosecutor obtained a search warrant for entering apartment 407G to apprehend Sean Deaton and provided the same to Officer Myers.

After his arrival, Lt. Evans attempted to talk Sean Deaton out of the apartment using the PA on one of the police vehicles, while several other patrolman monitored the perimeter of the scene.  Meanwhile, the CIRT squad assembled at police headquarters where they were briefed by Sgt. Lanning, who, as the ranking member of the CIRT team, approved a plan of action which called for a gradual escalation of force to obtain Sean Deaton's surrender.  After the briefing, the six member CIRT squad deployed to the scene where Lt. Evans was still attempting to garner a response from inside the apartment.

Pursuant to the CIRT team plan, after arrival and upon determination that Lt. Evans's efforts to verbally coax Sean Deaton out of the apartment were unsuccessful, the first action taken was Officer Kenneth Losekamp's ("Officer Losekamp") firing of wooden ferret rounds into the apartment.  One was shot into a front window and another into a rear window.  After waiting approximately twenty minutes while Lt. Evans again tried unsuccessfully to verbally raise a response from someone from within the apartment, four canisters of CS gas (a chemical munition) were shot into the apartment by Officer Losekamp.  Approximately ten to fifteen minutes later, Officer Losekamp tossed two more canisters into the apartment.  A total of six gas canisters were deployed into the apartment without any response from within.  After another fifteen to twenty minute wait, all six members of the CIRT team assembled and entered the apartment, using a key that had been provided by the apartment manager.  They searched the entire apartment, but found no one.

4

After the search of the apartment was completed, the fire department was summoned to set up exhaust fans to help rid the apartment of CS gas fumes.  Photographs of the apartment taken after the search had been conducted show furniture, clothing and other possessions in disarray.  Large burn marks, apparently from the gas canisters, were on the carpeting and a pillow.  Broken glass was on the floor and a dusty residue covered much of the interior area.  The apartment management moved Plaintiff to another apartment, boarded the windows and secured 407G.  Plaintiff was unhappy with the results of her efforts to obtain assistance from the police in cleaning up after the incident.  She claims that the cost of the clean-up was in excess of $15,000 and that the residue from the gas canisters damaged her personal belongings, which she claims have a value of between $15,000 and $20,000, and are being kept in storage pending resolution of her claims.

Plaintiff filed this lawsuit against the City of Lawrenceburg (the "City"), twelve members of the police department whom she has specifically identified and another thirteen members of the force (collectively "Defendants") that she identifies only by "unit number."  She contends that the Defendants violated her Fourth and Fourteenth Amendment rights by utilizing excessive force in executing the search warrant, resulting in damage to her personal property.  In addition to her claim for damages to her property, pursuant to 42 U.S.C. § 1983 ("Section 1983"), Plaintiff also asserts a state law tort claim for infliction of severe emotional distress.  A summary judgment motion has been filed on

behalf of all the Defendants.

## Summary Judgment Standard

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In deciding whether a genuine issue of material fact exists, the court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party. *Id.* at 255.

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A party moving for summary judgment on a claim on which the nonmovant party bears the burden of proof at trial may discharge its burden by showing, "that is, pointing out" an absence of evidence to support the nonmovant's case. *Id*. at 325.

**Discussion**

At this point of the lawsuit, the specific questions the court must answer include whether Plaintiff has sufficient evidence to support either a claim under Section 1983 for her property damage or a tort claim for infliction of emotional distress; and, if so, against which defendants she may proceed with such claims.  The broader question is whether this ill-fated search effort went beyond departmental embarrassment into the realm of actionable conduct by any of the police officers.  The Defendants assert numerous defenses as bases for granting a summary judgment in their favor.  The court concludes that some, but not all, of those asserted defenses have merit.

State Law Claim

Plaintiff claims that she was in the "zone of danger created by the Defendants" and therefore is entitled to recover for the infliction of severe emotional distress.  In their summary judgment motion, Defendants argue that there is no evidence that they intended to harm Plaintiff emotionally and that the standard for recovery under Indiana law is that the conduct complained of must be intentional or so reckless and atrocious as to be utterly intolerable in a civilized community.  *See Cullison v. Medely*, 570 N.E.2d 27, 31 (Ind. 1991); *Gable v. Curtis*, 673 N.E.2d 805, 809 (Ind. App. 1996).  Defendants' argument is well taken and Plaintiff fails to reply to this argument in her response brief.  The failure of a plaintiff to offer any response to a well developed and supported summary judgment

argument that challenges a particular claim should be considered an abandonment of that claim or issue. *See Weinstein v. Schwartz*, 422 F.3d 476, 477 n. 1 (7th Cir. 2005) (finding waiver of argument on appeal); *Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 2003) (affirming summary judgment for defendant on policy and custom claim). Furthermore, it is impossible for Plaintiff to simultaneously maintain, as she does in her affidavit, that she was "kept at a distance from the apartment and not allowed to enter when the police conducted the search," while also maintaining in her complaint that she was "in the zone of danger." Defendants are entitled to summary judgment on Plaintiff's infliction of emotional distress claim.

Claim Pursuant to 42 U.S.C. § 1983

A claim for property damage occasioned during the execution of a valid search warrant is evaluated pursuant to the general touchstone of reasonableness which governs Fourth Amendment analysis. *Heft v. Moore,* 351 F.3d 278, 282 (7th Cir. 2003)(citing *Untied States v. Ramirez,* 523 U.S. 65 (1998). Even though the entry may be lawful, "excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment." *United States v. Ramirez*, 523 U.S. 65, 71 (1998). Violations of an individual's Fourth Amendment rights, perpetrated under color of law, may be pursued in accordance with 42 U.S.C. § 1983.

In *Heft v. Moore*, 351 F.3d 278 (7th Cir. 2003), the plaintiff was knocked down by

the door of her home as the police used a battering ram to enter the house in order to

execute a valid search warrant for illegal drugs.  The plaintiff in *Heft* claimed that in

addition to suffering personal injuries, her home was in a state of devastation immediately

following the police raid.  *Id.* at 282.  As in the case at bar, the officers who entered the

home claimed that the house was cluttered, disorderly and so messy as to make it difficult

to move around.  *Id.* at 280.  The Seventh Circuit affirmed a summary judgment on the

property damage claim, stating:

> Even construing all of the facts in the light most favorable to Heft, however,
> there is no genuine issue of material fact.  The entirety of evidence
> presented by Heft in support of her claim that the defendants used
> unreasonable force in the search of her home was her allegation that her
> home was in a state of devastation immediately after the police raid.  While
> the defendants agreed that they moved several items that belonged to Heft
> during the course of the search, they also alleged that her house was
> cluttered and disorderly prior to the search.  Heft provided no evidence
> regarding the pre-search condition of her home or any specific evidence that
> any property item was damaged.  In other words, Heft failed to provide
> evidence that the police harmed her property at all, let alone provide
> evidence that the police harmed her property unreasonably.

*Id.* at 282.

The case at bar differs from *Heft* insofar as Plaintiff has offered evidence to

establish that she did suffer some property damage.  The photographic evidence she has

made of record shows damage to the apartment and its fixtures, which she did not own, as

well as damage to her own personal property such as a pillows, bedding, clothing and

furniture.  The damage was clearly caused by burns from the gas canisters and the residue

left behind from the deployment of so many gas canisters.  A material question of fact

remains as to whether the damaged items could be cured by extensive cleaning or if the residue has permanently destroyed any value. However, as noted by the Defendants, the credibility of Plaintiff's own assessment of her property damages as totaling between $15,000 and $20,000, is highly questionable. While likely not near as costly as Plaintiff asserts, there is demonstrable damage nonetheless. In the end, like the question of the reasonableness of the search activities here, the amount of damage done to the personal property remains an open material question of fact. It goes without saying that Plaintiff may not recover for damages to the apartment itself.

The circumstances presented are certainly such that it would be entirely within reason for a jury to determine that the property damage that did occur was the result of unreasonable force used during the course of the search for Sean Deaton. Based on the court's reading of the record to this point[2], the police engaged in all of their actions based on the statement of an individual who was in an extremely anxious and agitated state and in apparent fear of physical harm from her former husband. She, and no one else, reported to the first officer on the scene that Sean Deaton was seen entering apartment 407G. Further, the only factual underpinning for anyone's belief that Sean Deaton was

_____

[2]Plaintiff submitted the affidavit of Emanuel Brightwell, a member of the U.S. Army who was visiting a relative at the Village Apartments on the night in question. Mr. Brightwell watched the events of the evening and opines that the police unnecessarily escalated the search to an excessive use of force and chemical weaponry. Defendants object to the affidavit as conclusory, lacking adequate foundation and speculative. That objection is well taken and the court does not rely on the assertions contained in Mr. Brightwell's affidavit in reaching its decision with regard to the motion for summary judgment.

armed and dangerous that night was his ex-wife's statement that she knew he had possessed a small handgun at one time - not that he was carrying the gun at the time or that she saw him with it.  Whatever statement regarding violent tendencies which may have been included in the NCIC report has not been clarified in the record and the report has not been submitted as evidence.

With the question of reasonableness still an open one for the jury to determine, there remains the issue of which Defendants are subject to potential liability.  Each of the Defendants claims at least one basis for the court finding that they could not be held liable under the circumstances.  Many of the Defendants have legitimate defenses and do not belong in this case, but some must remain as Defendants.

In order for a municipality to be found liable under Section 1983, the Plaintiff must identify a policy or custom of the municipality which was put into practice and resulted in her damages.  *Monell v. Dept. of Social Services,* 436 U.S. 658 (1978). Plaintiff has not identified such a policy or custom which was followed that night.  In fact, she complains that none of the officers at the scene contacted the police chief or assistant chief to obtain authorization to use the CS gas, as required by the department's standard operating procedures.  She does argue that the City failed to properly train its officers with regard to the use of the CS gas, opining without any noted expertise that the gas is dangerous and requires special training for its use.  As support, she submits the clean-up instructions she was given by the Lawrenceburg Fire Department which deal

11

with "chemical munitions."

Inadequate training of police can form a basis for municipal liability under Section 1983. *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989). However, Plaintiff's claim against the City fails because she has designated no competent evidence of the dangers she claims are associated with the use of CS gas nor any evidence of a lack of training regarding those dangers. Officer Losekamp testified in his deposition of the training he received in the use of CS gas and other chemical munitions. Plaintiff's only response to this is an unsupported comment in her response brief that his training log does not confirm Losekamp's assertion. There is insufficient evidence of record to support Plaintiff's claim against the City and, therefore, the City is entitled to summary judgment in its favor.

There are additional Defendants who are entitled to a judgment in their favor as a matter of law. In order to prevail on a claim against a police officer for the use of unreasonable force in conducting police activities, a plaintiff must establish each individual officer's personal responsibility for the unreasonable force used. *See Miller v. Smith,* 220 F.3d 491, 495 (7th Cir. 2000). If the officer did not personally employ excessive force, he or she must have had a realistic opportunity to step forward and prevent a fellow officer from violating the plaintiff's constitutional rights. *Id*. It is clear here that such a prerequisite eliminates all but three of the Defendants as potential liable parties.

12

Officer Losekamp is the member of the CIRT team who deployed all six of the gas canisters into Plaintiff's apartment.  If the use of so many gas canisters was unreasonable and in violation of Plaintiff's constitutional rights, he could be found liable for the resulting damages.  While Plaintiff suggests that the actual physical search of the apartment caused drawers of clothing to be dumped and furniture to be upended, she has no evidence that any of the other CIRT team members actually damaged any of her property.  Plaintiff's claim clearly is centered around the damage caused by the alleged excessive use of the CS gas.  In fact, much like the *Heft* case, other than establishing that a pillow and other bedding were burned by gas canisters and that the bulk of her property was covered with an ashy residue following the use of the CS gas, Plaintiff offers no evidence confirming the difference in the condition of her property post-search efforts.  Outside the residue and burns, there is no evidence of record of any specific damage to personal property resulting from the physical search other than Plaintiff's affidavit testimony that a poster was ripped from the wall, a table top was knocked off, a child's bed set on its end and clothes and animal bedding were dumped across the floor.  The court has no problem concluding that these minor inconveniences do not constitute an unreasonable deprivation of property which could call into question a violation of constitutional proportion.  Consequently, only Officer Losekamp and any official reasonably positioned to stop his use of the CS gas, could be subject to liability for the property damage resulting from the deployment of the six gas canisters.

The evidence suggests that only two other officers were in a position to prevent Losekamp from executing on the plan to repeatedly deploy chemical munitions into the apartment.  Those two officers are Sgt. Lanning, the shift supervisor who also was the officer in charge of the CIRT squad, and Lt. Evans, the highest ranking police officer at the scene whose efforts to converse with anyone who might have been in apartment 407G yielded no verbal or physical confirmation that anyone was present.  Sgt. Lanning decided that the CIRT squad would ramp up the degree of force utilized to the point of employing CS gas and he could have called off that plan at any time prior to the deployment of all six gas canisters.  According to Sgt. Lanning's deposition testimony, Lt. Evans was not technically a member of the CIRT team, but because he was the senior officer at the scene he was empowered to step in and change the orders if he determined that the steps being taken were not appropriate for the situation.

Officer Losekamp, Sgt. Lanning and Lt. Evans all assert immunity as a basis for avoiding liability.  They first assert absolute immunity, arguing that they were acting quasi-judicially in carrying out a valid search warrant.  However, an officer's conduct in carrying out a search warrant is always subject to judicial review for unreasonableness. *Dalia v. United States,* 441 U.S. 238, 258 (1979).  Their assertion of qualified immunity requires the court to engage in a two step analysis to determine if the circumstances were such that qualified immunity applies.

Whether or not a police officer or other government official is entitled to qualified

immunity for a discretionary act is a question of law for the court to decide.  *Hughes v. Meyer*, 880 F.2d 967, 969 (7th Cir. 1989).  Though it is a defense, once raised by the defendant it becomes the burden of the plaintiff to overcome the defense.  *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008).  In order for a plaintiff to overcome the defense of qualified immunity a two-part determination must be made:  (1) the court must conclude that the actions of the officer violated the plaintiff's constitutional rights, and (2) the contours of the right at issue must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right. *Lee v. Young*, 533 F.3d 505, 512 (7th Cir. 2008).

As indicated previously, when the facts are construed in a manner most favorable to the Plaintiff, there is a genuine issue of triable fact as to whether her Fourth Amendment rights were violated by the manner in which Officer Losekamp and his supervising officers utilized the CS gas in executing the search warrant.  The facts of record which support such a conclusion include:

- Terri Deaton, Sean Deaton's ex-wife who was admittedly not calm and composed, was the only person who told any officer that Sean Deaton was in apartment 407G.
- Even if Sean Deaton had entered apartment 407G, there was a back door to the apartment from which he could have exited before the police ever reached the scene.
- Other than the fact that there was a light on in the apartment, there was no sign of anyone in the apartment. No movement, shadows or other sign of a person being present were seen.
- Close to two hours of attempted verbal contact by police yielded nothing.
- No one reported that Sean Deaton was armed.

- How Sean Deaton may have been able to access Plaintiff's apartment was unknown to the officers.
- The officers were given permission to enter the apartment and offered a key by both Plaintiff and the management of the apartments.
- The wooden ferret rounds shot into the apartment yielded nothing.
- When the use of force was escalated to CS gas, Losekamp immediately used four canisters - as opposed to one or two - for a relatively small apartment.
- Two additional canisters were tossed into the apartment before the police physically searched for Sean Deaton.
- Much of Plaintiff's personal property has been destroyed or significantly harmed by an ashy coating of residue from the use of the CS gas canisters.

If a jury were to accept a construction of the facts favoring Plaintiff's claim, this court believes it is clear that a reasonable police officer, acting at the time that Officer Losekamp, Sgt. Lanning and Lt. Evans acted, would have known that there was a high likelihood that the apartment was empty and that deploying six canisters of CS gas could cause considerable damage to the personal property of Plaintiff. The court has not located a case with a similar factual pattern involving an innocent personal property owner who has no relation to the person who is the subject of a search warrant and whose property suffers significant damage as a result of the deployment of six canisters of CS gas into a relatively small dwelling. However, to repeat, the Supreme Court made it very clear in *United States v. Ramirez*, 523 U.S. 65 (1998), that a violation of the Fourth Amendment occurs when excessive or unnecessary destruction of property results from a search. *Id.* at 71. Accordingly, Officer Losekamp, Sgt. Lanning and Lt. Evans are not entitled to qualified immunity.

16

**Conclusion**

Based on the admissible evidence of record, Defendants' Summary Judgment

Motion (Docket # 33) is **GRANTED IN PART** and **DENIED IN PART**.  A material

question of fact remains that prevents the court from granting summary judgment in favor

of Officer Losekamp, Sgt. Lanning and Lt. Evans with respect to Plaintiff's claim,

pursuant to Section 1983, for damages to her personal property occasioned by the

exercise of undue force in connection with the execution of a search warrant at her

apartment.  However, those three Defendants are entitled to summary judgment on

Plaintiff's state law claim for infliction of emotional distress.  All other Defendants are

entitled to summary judgment on the entirety of Plaintiff's Complaint.

**SO ORDERED** this 2nd day of March 2010.

_____

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

J. David Bender
J. DAVID BENDER
jdbenderlaw@aol.com

17

Douglas Alan Hoffman
CARSON BOXBERGER
hoffman@carsonboxberger.com

Harry D Rankin
Sutton Rankin Law, PLC
hrankin@suttonrankinlaw.com

Joseph Wilber Votaw III
VOTAW & KISOR
josephvotaw@earthlink.net